# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| AMERISPEC, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:20-cv-02365-TLP |
| v. | ) | |
| | ) | |
| SUTKO REAL ESTATE SERVICES, INC., | ) | |
| SRE HOME INSPECTIONS, INC., | ) | |
| THOMAS SUTKO, and JOHN SUTKO, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks a preliminary injunction to enforce a noncompete provision against Defendants Sutko Real Estate Services, Inc. ("SRESI"); SRE Home Inspections, Inc. ("SREI"); Thomas Sutko ("TS"); and John Sutko ("JS").  (ECF No. 17.)

Defendants responded arguing that a preliminary injunction is unwarranted for three reasons.  (ECF No. 44 at PageID 784.)  First, TS and SRESI are not competing against Plaintiff.  (*Id.*)  Second, TS and SRESI have complied with the Mutual Termination and Release Agreement ("MTRA") that they entered into with Plaintiff as part of the cessation of their franchisor–franchisee relationship.  (*Id.*; *see* ECF No. 48-9 at PageID 1113.)  Third, JS and SREI are not subject to the noncompete provision, and they have not used any of Plaintiff's proprietary information.  (ECF No. 44 at PageID 784.)

The Court held a preliminary injunction hearing during which the Court heard testimony from TS; JS; and Mr. Chris Gammill, a brand manager for Plaintiff.  (*See* ECF No. 47; *see also* ECF No. 46; ECF No. 48 (collecting exhibits presented during hearing).)

For the reasons below, the Court **GRANTS** Plaintiff's motion.  The Court issues a preliminary injunction over all Defendants.

## BACKGROUND

### I.      Factual Background[1]

#### A.      The Franchisor–Franchisee Relationship

Plaintiff is a national franchisor of residential and commercial property inspection services with 118 independently owned franchises operating in 176 territories throughout the United States.  (ECF No. 28 at PageID 431.)

TS signed two franchise agreements with Plaintiff in 2010 after he bought territories from Plaintiff's previous franchisee, Mr. John Wanniger, "who had been operating [a Plaintiff] franchise business in Lincoln and Omaha since 1997."[2]  (*Id.* at PageID 432.)  TS operated that franchise business under the corporate name SRESI.[3]  (*Id.*)

Five years later, TS and SRESI renewed the franchise agreements for the business territories in Lincoln and Omaha.  (*Id.*)

---

[1] The Court derives the facts presented here from Plaintiff's amended complaint (ECF No. 28); Plaintiff's motion for a preliminary injunction (ECF No. 17); and Defendants' response to Plaintiff's motion for a preliminary injunction (ECF No. 44).

[2] During the hearing, TS testified that the purchase contract with Mr. Wanninger included a 7-year noncompete provision.  He also testified that they entered into a so-called handshake deal under which with Mr. Wanninger would never compete with TS.  But within seven years of the purchase, Mr. Wanninger opened a competing business.  TS admitted that he had sued Mr. Wanninger to get a TRO and an injunction, alleging in that lawsuit that Mr. Wanninger had caused him irreparable harm.  Plaintiff has included records of that lawsuit as part of the record here.  (*See* ECF No. 46-1 at PageID 820–24; ECF No. 66-2 at PageID 844–55.)

[3] Besides heading SRESI, TS ran several businesses from the same business location:  SRE Homeservices, LLC, a radon testing and mitigation business; Sutko Termite Services, Inc., a termite and pest control business; and Leapin Lizards Locksmiths, a locksmith service business. (*See* ECF No. 28 at PageID 433–34.)

These franchise agreements provided "license and right to operate a residential and commercial property inspection business under [Plaintiff's] trademarks and logos using [Plaintiff's] unique Operating System, marketing techniques and materials, training, forms and assistance in their designated Territories in Lancaster and Douglas Counties in Nebraska."[4]  (*Id.* at PageID 432–33; *see also* ECF No. 29; ECF No. 30.)  They also contained the following noncompete provision:

> 15.    COMPETITION
>
> The Franchisee acknowledges the Company must be protected against the potential for unfair competition by the Franchisee's use of the Company's training, assistance and trade secrets in direct competition with the Company.  The Franchisee therefore agrees that it shall not, during the Term of the Franchise, either directly or indirectly, operate, own, be employed by, or consult with, any other business which performs any of the various programs and services licensed by the Franchisor included within the System of Operations, or other systems or programs licensed by the Franchisor under the Proprietary Marks, both within and outside the Territory, other than one operated under this Agreement with the Company.  *Further, the Franchisee agrees that it shall not, for a period of one (1) year following the effective date of termination or expiration of this Agreement or following the assignment  . . . , either directly or indirectly, operate, own, be employed by, or consult with, any business conducting any type of residential and commercial building inspections, or providing residential or commercial property inspection services, within the Designated Territory, within ten (10) miles of the Designated Territory, or within a radius of ten (10) miles from the location of any other [Plaintiff's] office in existence at the time of expiration, termination, or assignment of this Agreement.*

(ECF No. 30 at PageID 483) (emphasis added.)

JS, who is TS's son, joined SRESI in 2016 in the role of vice president.  (ECF No. 28 at PageID 429; ECF No. 34 at PageID 563.)  In that capacity, JS handled "the day to day activities of the business as well as assisting in marketing and business development initiatives."  (ECF No. 34 at PageID 563.)

---

[4] The Court notes here that Lincoln is in Lancaster County, and Omaha is in Douglas County.

### B.    The Franchisor–Franchisee Relationship Terminates

In May 2020, Plaintiff and TS entered into the MTRA "under which the parties agreed to terminate the Franchise Agreements and cease their franchise relationship."[5]  (ECF No. 28 at PageID 438.)

The MTRA contained a provision requiring TS to "comply with all post-termination obligations set forth in the Franchise Agreements, specifically including all post-termination noncompete obligations."  (*Id.*)  That provision reads:

> 2.  <u>Survival of Termination and Indemnity Obligations.</u>  Notwithstanding anything to the contrary contained in this Agreement. the terms and conditions of the Franchise Agreements addressing the rights and obligations of Franchisor and Franchisee upon termination, *including but not limited to those provisions with respect to indemnification and non-competition*, are hereby continued in full force and effect.

(ECF No. 33 at PageID 555) (emphasis added.)  As stated, the MTRA also included an integration clause incorporating the noncompete provision from the franchise agreements.  (*See* ECF No. 48 at PageID 1113.)  Defendants' alleged post-termination activities led to this suit.

### C.    Post-Termination Activities

Plaintiff claims that, after entering into the MTRA, TS and JS kept operating the business as if the termination had not occurred:  "Defendants sent their employee inspectors out to conduct inspections wearing [Plaintiff's] uniforms, driving [Plaintiff's] trucks[,] maintaining [Plaintiff's] website, answering the phone as [Plaintiff][,] and in all material respects continued operations unchanged."  (ECF No. 28 at PageID 438.)

---

[5] During the hearing, TS testified that, leading up to signing into the MTRA, he had stopped paying franchise fees to Plaintiff.  When the parties entered into the MTRA, Plaintiff agreed to relieve TS of some of the fees that he owed.  But he still agreed to pay around $84,000 when entering into the MTRA.  (*See* ECF No. 48 at PageID 1113.)

Defendants also allegedly tried to use some of Plaintiff's proprietary information that they had promised not to use as part of the MTRA.  (*Id.* at PageID 439.)  They tried to gain access to software owned by Plaintiff that "collects and maintains information regarding all customers and real estate agents, brokers and title companies that refer work to [Plaintiff's] franchisees, as well as all inspections performed in the past and all inspections scheduled to be performed in the future."  (*Id.* at PageID 438–39.)

What is more, two days after Plaintiff and TS entered into the MTRA, JS announced that he created a new property inspection company called SREI.  (*Id.* at PageID 440.)  SREI, however was similar—indeed, almost identical—to SRESI.  (*Id.*)

Not only are the names of the businesses similar, the new company had the same office manager, senior customer service representative, and bookkeeper as SRESI.  (*Id.* at PageID 440–41.)  And "[m]ost or all of the inspectors who performed inspections for [SRESI were] are now conducting inspections for the competing business [SREI]."  (*Id.* at PageID 441.)

TS also facilitated the incorporation of SREI through the execution of a so-called Consent to Use Similar Name document.  (*Id.*)  Executing that document allowed SREI to register with Nebraska a similar corporate name to TS's radon testing and mitigation businesses called SRE Homeservices, LLC.  (*Id.*)

### D.     The Cease and Desist Letter and Later Developments

Having learned about Defendants' intention to continue SRESI's operations under a different name, Plaintiff "sent Defendants a Cease and Desist letter demanding they comply with the terms of their Franchise Agreements and gave them three days to comply."  (*Id.* at PageID 442.)  TS responded to the letter "offering to return manuals, assign phone numbers and

cease using [Plaintiff's] trademarks."  (*Id.*)  He also acknowledged the existence of SREI, "but disclaimed any ownership of that entity."  (*Id.* at PageID 443.)

Furthermore, as confirmed during the preliminary injunction hearing, SREI moved out of the office used by SRESI three days before the hearing, and it is now "being run out of the homes of the employees while [SREI] searches for a different office space."  (ECF No. 44 at PageID 803.)  SREI has changed its name to TruHome Inspection Services, Inc. ("TruHome").[6] (*Id.* at PageID 789.)  And as Mr. Gammil testified during the hearing, Plaintiff has secured a new franchisee, Mr. Neil Peter, who will continue Plaintiff's operations in Lincoln and Omaha.

## II.    Procedural Background

As a result of these events, Plaintiff sued Defendants for their alleged failure to abide by the MTRA.  (*Id.*)

Plaintiff then quickly moved for a temporary restraining order ("TRO") and preliminary injunction against Defendants "and all those in active concert or participation with them," requesting that the Court enjoin Defendants from unlawfully competing with Plaintiff "and its New Franchisee in the Designated territories for one year."  (ECF No. 17-1 at PageID 271.)

The Court held a hearing on Plaintiff's motion for TRO, during which it granted Plaintiff's motion.  (*See* ECF No. 40; ECF No. 41.)  The Court enjoined Defendants for a 14-day period from unlawfully competing with Plaintiff and ordered them to comply with confidentiality and post-termination and post-expiration obligations in the franchise agreements. (*See* ECF No. 40.)

---

[6] For this order, the Court finds that no differences separate SREI from TruHome.  Thus, the Court's findings about SREI's obligation not to compete with Plaintiff apply equally to TruHome.

Thirteen days after granting Plaintiff's TRO motion, the Court held another hearing, this time on Plaintiff's request for a preliminary injunction. (*See* ECF No. 47.) At the end of the hearing, the Court extended the TRO on Defendants for another 14-day period and told the parties that it would take the motion for preliminary injunction under advisement. (*Id.*)

Defendants oppose Plaintiff's motion for preliminary injunction. (ECF No. 44.) Plaintiff has not replied to Defendants' response.

For the reasons below, the Court **GRANTS** Plaintiff's motion for preliminary injunction. The Court thus enjoins Defendants according to the conditions described below.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), a district court may issue a preliminary injunction before a trial on the merits.

In deciding a motion for preliminary injunction, the procedures are less formal and the evidence is less complete than at the time of trial, so "a party is not required to prove his case in full at a preliminary injunction hearing… ." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal quotation marks omitted)); *but see Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion"). And this Court's findings of fact and conclusions of law are not binding at the trial on the merits. (*Id.*)

A preliminary injunction is an equitable remedy, though an "extraordinary" one, that the Court has the sound discretion to grant or deny. *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 923 (6th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see*

also *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).

"[T]he party seeking the injunction must prove:  (1) that they are likely to succeed on the merits of their claim, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest." *Slatery*, 956 F.3d at 923 (citing *Winter*, 555 U.S. at 24).

The Court then balances these factors "against one another." *Leary*, 228 F.3d at 736 (6th Cir. 2000).  But the factors "should not be considered prerequisites to the grant of a preliminary injunction."  (*Id.*)  Although the standard is flexible, Plaintiff must make some showing of irreparable harm for the Court to grant its motion for a preliminary injunction.  *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 769 F.2d 100, 102–03 (6th Cir. 1982).  Additionally, "the strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if [an injunction] does not issue."  *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

## ANALYSIS

### I.     Likelihood of Success on the Merits

The first issue that the Court has to decide is whether Plaintiff is likely to succeed on the merits of its claim.  *Slatery*, 956 F.3d at 923.

To show that it is likely to succeed on the merits, Plaintiff must show that the franchise agreements here remain enforceable.  *See e.g., Am. Home Shield Corp. v. Ozur*, No. 16-cv-2400-SHL-tmp, 2016 WL 8738243, at *3 (W.D. Tenn. Sept. 13, 2016) ("Although Tennessee law governs the Agreement, the Court still must determine whether Plaintiff has shown that the Agreement is likely enforceable.")  Moreover, "[w]hile non-compete agreements are disfavored in Tennessee as a restraint on trade, Tennessee courts will uphold an agreement that protects a

'legitimate business interest' and is 'reasonable under the particular circumstances.'" *Id.*
(quoting *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984)). "[I]f a party
demonstrates substantial likelihood of success on the merits, the three other factors will favor
the party as well." *Total Car Franchising Corp. v. L & S Paint Works, Inc.*, 981 F. Supp. 1079,
1081 (M.D. Tenn. 1997) (citations omitted).

Defendants concede "that the non-compete provision contained in Plaintiff's franchise
agreements is enforceable as to [SRESI] and [TS]." (ECF No. 44 at PageID 793.) Defendants
also do not appear to dispute Plaintiff's assertion that it "has several legitimate business
interests that support enforcement of the Franchise [Agreements'] restrictive covenant,"
including "preserving customer good will," "protecting itself from unfair competition by former
franchisees," and "preserving the integrity of its franchise system."[7] (*See* ECF No. 17-1 at
PageID 273–278) (citations omitted.)

That said, Defendants argue that enforcing the noncompete provision here would be
unreasonable for three reasons. (*See* ECF No. 44 at PageID 792.) First, TS "has not violated
the terms of the agreed upon non-compete provision." (*Id.*) Second, JS and SREI "did not
agree to any non-compete provision." (*Id.*) And third, "the non-compete provision, when
applied to [JS], [SREI] or the employees of [SREI], [is] overbroad and unreasonable." (*Id.*)

---

[7] In support of Plaintiff's position, Mr. Gammil testified that SRESI had developed a list of 33
repeat customers—all real estate agents—who would customarily rely on the company's
services. The amount of fees paid by this group of agents was about $765,000 over an extended
amount of time. The Court finds that this list, as well as the associated customer information
generated while SRESI was in operation, are indeed valuable and worthy of protection on the
part of Plaintiff.

The Court will thus focus its analysis on these three arguments.  And for the reasons below, the Court finds that the noncompete provision is reasonable and extends to all Defendants, including JS and SREI (True Home).

## A.     The Noncompete Provision is Reasonable and Extends to JS and SREI

### 1.     Reasonableness

As mentioned above, to find that Plaintiff is likely to succeed on the merits, the Court has to decide whether enforcing the noncompete provision here would be "reasonable under the circumstances." *Hasty*, 671 S.W.2d at 472.

Plaintiff cites a string of cases to argue that "[t]here can also be no dispute that the scope of the covenant at issue here is reasonable."  (ECF No. 17-1 at PageID 278) (citations omitted.) According to Plaintiff, the noncompete provision "reflects the minimum time and scope necessary for [Plaintiff] to protect [its] legitimate business interests" and "will give [Plaintiff's] new Franchisee time in which to develop relationships with [Plaintiff's] customers and referral sources in Omaha and Lincoln."  (*Id.*)

Defendants do not directly respond to those arguments.  Instead, they claim that Plaintiff's position is unreasonable because the noncompete should not apply to non-parties to the contracts and because TS "is not in breach of the non-compete provision."  (ECF No. 44 at PageID 794.)

The Court finds Plaintiff's position is well-taken.  As explained below, the Court finds that the noncompete provision is reasonable under the circumstances here.

The Tennessee Supreme Court has described its standard for courts to assess the reasonableness of a noncompete provision:

> There is no inflexible formula for deciding the ubiquitous question of reasonableness, insofar as noncompetitive covenants are concerned.  Each case

must stand or fall on its own facts.  However, there are certain elements which should always be considered in ascertaining the reasonableness of such agreements.  Among these are: [1] the consideration supporting the agreements; [2] the threatened danger to the employer in the absence of such an agreement; [3] the economic hardship imposed on the employee by such a covenant; and [4] whether or not such a covenant should be inimical to public interest.[8]

*Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (1966).

What is more, "[t]he question of what is reasonable usually involve[s] the duration and geographic scope of the covenant, as well as other factors which balance one party's right to earn a living and to practice his trade against the other's right to be free from unfair competition."  *Servpro Indus., Inc. v. Pizzillo*, No. M2000-00832-COA-R3CV, 2001 WL 120731, at *6 (Tenn. Ct. App. Feb. 14, 2001) (citing *Central Adjustment Bureau v. Ingram*, 678 S.W .2d 28 (Tenn. 1984); *Berry*, 409 S.W.2d at 361).

### a.    Consideration

Here, the Court first finds that sufficient consideration supports the franchise agreements. TS worked with and for Plaintiff for around 10 years, performing a leadership role for its franchisee.  (ECF No. 44 at PageID 785, 795–96.)  And he voluntarily entered into the MTRA. (*Id.*)  These facts alone are enough to find that adequate consideration supports the franchise agreements here.  *Ozur*, 2016 WL 8738243, at *4 ("Courts are more likely to find the consideration adequate when there has been substantial 'actual performance in the form of continued employment.'") (quoting *Ingram*, 678 S.W.2d at 34).

---

[8] The Court will assess the fourth factor later in this order because public interest considerations are part of the four-pronged preliminary injunction test.  *See Winter*, 555 U.S. at 20.

**b.** **Threat to Plaintiff in the Absence of Noncompete Provision**

The Court also finds that the threatened danger to Plaintiff without the noncompete provision supports finding the provision reasonable.  First, Plaintiff has protectable business interests in preserving customer relationships that SRESI had cultivated while TS was at the company's helm, shielding itself from unfair competition, and conserving the integrity of its franchise system.  (*See* ECF No. 17-1 at PageID 273–278)

Plus, contrary to Defendants' claim (ECF No. 44 at PageID 794), Plaintiff has shown that "Defendant[s] might lure those customers away from Plaintiff."  *Ozur*, 2016 WL 8738243, at *4.  TS admitted during his testimony at the hearing and in an email that, after entering into the MTRA, he continued to service clients that he had served as Plaintiff's franchisee.  (ECF No. 48-12 at PageID 1127) ("Not knowing what to do, and not wanting [Plaintiff] to get a black eye, I requested one of the inspectors hired by [SREI] to cover it . . . .  I was the face of [Plaintiff], and while a franchisee I always took that responsibility seriously with customers.")

These facts show that, with no noncompete provision here, Defendants might imperil Plaintiff's business prospects, which weighs in favor of finding the noncompete provision reasonable.  See Ozur, No. 16-CV-2400-SHL-TMP, 2016 WL 8738243 (finding, with no noncompete obligation, harm on the part of the plaintiff because it had "a protectable business interest in the customer relationships cultivated by [the defendant] while he served as the face of the company" and "made a colorable claim that [the defendant] might lure those customers away from [the plaintiff].").

**c.** **Defendants' Economic Hardship**

Finally, the Court finds that enforcing the noncompete provision at issue will impose some "economic hardship" on Defendants, chiefly because they will not be at liberty to offer

property inspection services in the Lincoln and Omaha areas. *Berry*, 409 S.W.2d at 363. This hardship, however, does not overshadow the fact that TS entered into valid franchise agreements and, in doing so, voluntarily agreed not to compete with Plaintiff. (ECF No. 44 at PageID 785, 795–96.)

Besides, under Tennessee law, the scope of the noncompete provision is reasonable. *See Pizzillo*, 2001 WL 120731, at *8 (examining Tennessee decisions on covenants not to compete that hold that franchisor "should be able to protect the value of its franchises by preventing its former franchisees from competing against it" within 25 miles of the designated territory for two years). The noncompete provision only "forbids Defendants from operating a competing business in their Designated Territories, or within ten miles of the Designated Territories, for one year." (ECF No. 17-1 at PageID 278.) The Court thus finds that enforcing the noncompete provision here will not impose unreasonable "economic hardship" on Defendants. *Berry*, 409 S.W.2d at 363.

For these reasons, the Court finds that enforcing the noncompete provision is "reasonable under the circumstances." *Hasty*, 671 S.W.2d at 472.

### 2.    Extending the Preliminary Injunction to JS and SREI

The second issue under the Plaintiff's likelihood of success on the merits is whether the noncompete provision should apply to JS and SREI.

### a.    The Parties' Positions

Plaintiff argues that "[i]t is well-settled that non-signatories can be enjoined when those non-signatories conspire and assist the signator in the violation of the covenant's terms." (ECF No. 17-1 at PageID 279.)

According to Plaintiff, TS "obviously conspired" with JS when he prepared and facilitated "the wholesale transfer of the entire [Plaintiff] franchise business and assets to [JS] and [SREI]." (*Id.* at PageID 281.) Plaintiff claims that, "[e]ven if [JS] owns [SREI], [TS] facilitated and signed off on the incorporation documents allowing [JS] to use the name 'SRE Home Inspections' because it's virtually identical to [TS's] radon testing 'partner' business called 'SRE Homeservices.'" (*Id.* at PageID 282.) Plus, "when [JS] announced on May 6 that he was operating as [SREI], he specifically mentioned that he will have 'experienced inspectors in the field' and virtually all of the administrative staff from [Plaintiff's] franchise business now working for him." (*Id.* at PageID 282.)

Plaintiff thus concludes that SREI "is a mere continuation of the former Amerispec (franchise) business" that could not have happened "without planning, cooperation and a conspiracy between [TS] and [JS] to transfer the business in an effort to avoid the post-termination noncompete obligations in the Franchise Agreements." (*Id.* at PageID 283.)

In response, Defendants claim that, "even though Plaintiff considered [JS] an owner of the franchise, it never required [JS] to sign any agreement providing the protections it now asks this Court to provide it." (ECF No. 44 at PageID 797.) Because of this omission, Defendants argue that "Plaintiff's claim of a civil conspiracy between the Defendants to breach the contract is not supported by applicable law." (*Id.* at PageID 799.)

Defendants claim that, under Tennessee law, "a party to a contract cannot be liable as a co-conspirator for inducing the breach of its own contract" because "[o]ne is either in breach of the contract or not." (*Id.*) (citing *Freeman Management Corp. v. Shurgard Storage Centers, LLC*, 461 F.Supp.2d 629, 643 (M.D. Tenn. 2006)).

And "[e]ven if Tennessee law supported such a claim," Defendants argue that "the facts do not support extending an injunction to John, [SREI] or [SREI's]'s employees under Fed. R. Civ. P. 65(d)(2)."  (*Id.*)  According to them, TS never planned to compete with Plaintiff.  (ECF No. 44 at PageID 800–01.)  For instance, when TS downloaded customer data from Plaintiff-owned software in January 2020, he did so "in connection with his desire to test new software that Plaintiff had shared with all franchisees as an alternative or upgrade at a recent franchise convention."  (*Id.* at PageID 801.)

Ever since entering into the MTRA, Defendants claim that TS's actions "have been aimed at complying with his post-termination obligations, dealing with the ongoing legal demands of this lawsuit, and making sure [JS's] business is separated from the other businesses of [SREI]."  (*Id.* at PageID 800.)  For instance, although SREI "did operate for a short period of time out of the same office location that [SRESI] had used," (which is owned and operated by TS and his other businesses) TS was in no way involved with SREI.  (*Id.* at PageID 803.)  Plus, as TS testified during the hearing, TS recently entered into an asset sale and purchase agreement with JS, selling the assets of SRESI for a total $84,000, which shows that TS has formally decoupled his business interests from those of JS.[9]  (*See id.* at PageID 804.)  And TS testified that he never gave Plaintiff's customer list to JS.

Plaintiff's position is convincing.  For the reasons below, the Court finds that JS and SREI were "in active concert or participation" with TS when he acted counter to the franchise agreements and the MTRA.  Fed. R. Civ. P. 65(d)(2)(C).

---

[9] Interestingly, the price for those assets is the same amount that JS paid to Amerispec when he executed the MTRA.

### b.      Federal Rule of Civil Procedure 65(d)(2) Standard

Federal Rule of Civil Procedure 65(d) controls the scope of a preliminary injunction issued in a federal court.  Rule 65(d)(2) provides the following about who can be subject to a preliminary injunction:

> (2)  Persons bound. [A preliminary injunction] order binds only the following who receive actual notice of it by personal service or otherwise:
>     (A)  the parties;
>     (B)  the parties' officers, agents, servants, employees, and attorneys; and
>     (C)  other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2).

"Rule 65(d) 'is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.'" *Blackard v. Memphis Area Med. Ctr. for Women, Inc.*, 262 F.3d 568, 574 (6th Cir. 2001) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

"To determine whether a person is one who acts in concert or is identified in interest with the enjoined party, the court must look to the actual relationship between the person enjoined and the person thought to be bound by the injunction." *Id.*; *see also* 11A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2956 (3d ed. 2020) ("[T]he best way to approach the question of 'privity' may be to analyze the facts of each case in order to determine whether the requisite relationship exists between those enjoined and those against whom a contempt proceeding has been brought to justify a finding that the latter are in privity with the former."); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930) (L. Hand, J.) ("[T]he only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden . . . , but what it has power to forbid, an act of a party.

This means that the respondent must either abet the defendant, or must be legally identified with him.")

Here, as a threshold issue, the Court has to decide whether JS and SREI are "parties" or "other persons who are in active concert or participation with" TS under Rule 65(d)(2).

On one hand, JS and SREI are parties here.  On the other, however, they were not parties to the franchise agreements or to the MTRA, only TS was.  (ECF No. 17-1 at PageID 279.)

The Court finds that JS and SREI more appropriately fall under the category of "other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  Fed. R. Civ. P(65(d)(2)(C).

The reason for this choice is straightforward.  Plaintiff is effectively asking the Court to enforce TS's obligation not to compete under the franchise agreements and the MTRA, and then to extend that enforcement power over to two parties who were not party to those agreements.  Under Rule 65(d), the only way the Court can do so under is by finding that JS and SREI were "in active concert or participation" with TS when TS acted counter to his contractual obligation not to compete.  Fed. R. Civ. P.65(d)(2)(C).

### c.     The Preliminary Injunction Can Extend to JS and SREI

Having reviewed the record, the Court finds that JS and SREI actively participated with TS when TS violated his agreement not to compete.  For the reasons below, the Court thus finds appropriate to extend the preliminary injunction to JS and SREI here.

For one, the record, including most notably many emails sent by SREI staff to customers and other company contacts of SRESI during the transition from SRESI to SREI, shows that SREI told customers that it was terminating its relationship with Amerispec as SRESI, but in name only.  (*See e.g.,* ECF No. 46-11 at PageID 892–912.)

For instance, Ms. Sue Lee, an employee of SRESI who had continued on with SREI,

wrote an email to what seems like a customer that SREI had "severed ties with the [Plaintiff]

franchise and will continue doing business as [SREI].  *Same people, same report.*"  (*Id.* at

PageID 892) (emphasis added.)  In another email, Ms. Lee states the following:  "We were

currently a Franchise of [Plaintiff] and we severed ties with them on Monday 5/4/2020.  *Our*

*"New" Company is [SREI].  We are the same staff and certified inspectors as we were on*

*Monday, just a different name.*"  (*Id.* at PageID 893) (emphasis added.)

These emails, and a slew of other ones in the record, corroborate Plaintiff's allegation

that SREI "is a mere continuation of the [Plaintiff's former] business, operating out of the same

location, in the same Designated Territories," and using the same equipment. [10]  (ECF No. 17-1

at PageID 283.)

Second, the record makes clear that JS had taken the helm of SREI.  Many times JS

identified himself by email as SREI's owner.  (*See e.g.,* ECF No. 46-6 at PageID 868–74.)

SREI's employees also represented many times that John was the company's owner.  (*See e.g.,*

*Id.* at PageID 900–02.)

Through JS's leadership role in SREI, the Court finds that JS knew that SREI identified

itself to customers as SRESI's replacement company.  (*See e.g.,* ECF No. 46-14 at PageID 929)

(showing an email correspondence where JS replies enthusiastically to what appears like new

---

[10] The Court notes that, when asked about the implications of the email exchanges about SREI, TS's testimony was vague and, at times, hard to understand.  He said that the transition from SRESI to SREI was chaotic, and that he had failed to communicate properly with his employees.  He also stressed that he was trying to decouple SRESI from SREI.  But he did not provide clear details to that effect.

marketing material identifying SREI as a "new" company with "[s]ame office staff & inspector(s)," but "now just completely 100% locally owned & operated").

Third, and more importantly, the facts here show that TS orchestrated the creation of SREI, and he did so with willing participation on the part of his son, JS.

As Plaintiff makes clear, TS "facilitated the incorporation of [SREI] by executing a 'Consent to Use Similar Name' in connection with the corporate filings in which [TS], on behalf of 'SRE Homeservices, LLC,' consented to the use of the name "[SREI]" in the State of Nebraska and requested that the Nebraska Secretary of State accept the Articles of Incorporation of [SREI] using that name." (ECF No. 17-1 at PageID 269; *see also* ECF No. 36 at PageID 622–24 (showing articles of incorporation and "Consent to Use Similar Name" document).

By doing so, the Court agrees with Plaintiff that Defendants are competing with AmeriSpec's home inspection services. "Defendants are now selling and soliciting real estate inspection services under that name using a logo that is virtually identical to the logo used by [TS] for his radon testing 'partner' business under the name 'SRE Homeservices.'" (*Id.*; *see also* ECF No. 36 at PageID 626 (showing SREI's new marketing material)).

What is more, as made clear during the preliminary injunction hearing, TS was behind and personally approved much of the logistics related to creating SREI.

For example, TS led the charge in designing the new business cards for SREI.[11] (*See* ECF No. 46-16 at PageID 938.) Ms. Mindy Dunn, who was one of SRESI's employees, coordinated the employee benefits for SREI, doing so seemingly at the direction of TS.[12] (*See*

---

[11] TS did not copy JS on that email.

[12] JS admitted during his testimony that Ms. Dunn still works for TS's businesses, but that she helps JS with bookkeeping for his new business.

ECF No. 46-17 at PageID 941) (providing to the managing director of the benefits company TS's new phone number and representing that "[r]eally nothing has changed but a name").  Ms. Dunn also coordinated the transfer of so-called eKey accounts from SRESI to SREI, essentially allowing JS to have access to customer inspection sites through accounts that had once belonged to SRESI.  (*See* ECF No. 46-13.)  And in an email to an employee at a realty company, JS stated that his "father has stepped down and is no longer in the home inspection business," but that he had "*retained* all of [SRESI's] great people (office staff and inspectors) to *continue* to bring a higher level of professionalism to the home inspections *we* do."  (ECF No. 46-6 at PageID 873) (emphasis added.)

These facts, as Plaintiff contends in its motion and reiterated during the hearing, help show that "[t]he overnight transfer of the [Plaintiff's entire business], including all assets and personnel from [TS] to [JS] could not take place without planning, cooperation and coordination between father and son."  (ECF No. 17-1 at PageID 281–82.)

Finally, the Court finds that, when Defendants tried to access Plaintiff-owned proprietary information after entering into the MTRA, doing so was proof of TS's intention to continue SRESI's business operations in competition with AmeriSpec.  (*See* ECF No. 17-1 at PageID 267) ("Within minutes after AmeriSpec terminated Defendants' access to the Customer and Agent Database, Defendants and certain of their employees contacted the software company directly and requested that the company reset the passwords for Defendants and certain of their employees so they could gain access to the Customer and Agent Database.")

The proof shows TS first gained access to that information in early January 2020, only one day after Plaintiff and TS began negotiations over the termination of their franchisor–franchisee relationship.  (ECF No. 17-1 at PageID 267; ECF No. 44 at PageID 801.)  As

Plaintiff contends, TS's actions foreshadowed his intention to continue SRESI's business operations or at least compete with AmeriSpec after the termination of the franchisor–franchisee relationship. (ECF No. 17-1 at PageID 267.)

Defendants claim that "[TS's] download of the customer data in January of 2020 was not prohibited by the terms of his franchise agreements or the software license agreements executed with Plaintiff." (ECF No. 44 at PageID 801.) According to them, he "had the right to download" that information "and use it [in] connection with his business." (*Id.*)

Defendants well may be correct. But their claim far from disproves the possibility that TS intended to use that information when his relationship with Plaintiff would eventually terminate. In fact, that Defendants tried to access Plaintiff's customer data "within minutes after" entering into the MTRA may be—and likely is—evidence that TS planned to use that information to compete against Plaintiff, even after entering into the MTRA. (ECF No. 17-1 at PageID 267.)

For the reasons above, the Court thus finds that TS was in "active concert or participation" with JS and SREI when he acted counter to this contractual obligation not to compete. Fed. R. Civ. P(65(d)(2). First, the record shows that SREI identified itself to customers as SRESI, but only with a different name. Second, JS approved of SREI identifying itself as a mere replacement of SRESI. And third, TS was the moving force behind creating SREI, coordinating with JS how the company would continue to operate as a viable property inspection business in the Lincoln and Omaha areas. That JS admitted during his testimony that he still refers SREI's clients to TS's businesses, as was the practice when SRESI operated as one of Plaintiff's franchises, further evidences that TS has a vested interest in success as a property inspection business.

The Court finds that the noncompete provision is reasonable and extends to JS and SREI (and TruHome).  By extension, the Court finds that Plaintiff's claim to enforce the noncompete provision here is likely to succeed on the merits.

## II.   Irreparable Harm

The second factor that the Court has to consider is whether Plaintiff will suffer irreparable harm without the injunction.  *Slatery*, 956 F.3d at 923.

Plaintiff argues that "[t]here is a recognized potential for irreparable harm when a covenant against competition is disregarded."  (ECF No. 17-1 at PageID 283.)  It claims that, "[o]nce Defendants have appropriated [] customer goodwill, the loss to [Plaintiff] cannot be quantified in terms of monetary damages alone, as the number of lost customers, and the number of lost sales to [Plaintiff's] system over time, will be impossible to determine."  (ECF No. 17-1 at PageID 284.)

In response, Defendants argue that "Plaintiff's argument is almost entirely made up of theoretical harm . . . , not actual harm that it will  suffer in this case."  (ECF No. 44 at PageID 806.)  They argue, for instance, that "Plaintiff offers no evidence that customers within the Designated Territory look to [Plaintiff's] brand in choosing to do business with the Defendants."  (*Id.* at PageID 807.)  They also argue that "Plaintiff has not shown that any injury the Plaintiff might suffer is irreparable and cannot be addressed in a judgment by an award of damages and a permanent injunction."  (*Id.* at PageID 808.)

The Court finds Plaintiff's position well-taken.  For the reason below, the Court finds that Plaintiff has shown that it will suffer irreparable harm without an injunction here.

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington–Fayette Urban County*

*Gov't*, 305 F.3d 566, 578 (6th Cir.2002).  "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992) (citing *Roland Mach. Co. v. Dresser Indus.*, Inc., 749 F.2d 380, 386 (7th Cir.1984)).

Here, as the Court mentioned above, TS admitted that he continued to service the same clients that he had served under Plaintiff's name, even after entering into the MTRA.  (ECF No. 48-12 at PageID 1127.)  What is more, through active participation on the part of TS, SREI has continued to operate as if it were SRESI, but only under a different name.  (*See e.g.,* ECF No. 46-11 at PageID 892–912.)  Finally, evidence shows that SREI has tried to benefit from some of Plaintiff's proprietary information to advance its own business interests.  (*See* ECF No. 17-1 at PageID 267.)

These behaviors are the kinds that parties try to prevent through noncompete provisions. They are also the kinds that Sixth Circuit has found to cause irreparable harm.  *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate."); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("[T]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."); *see also ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.*, No. 01 CIV. 2229 (JSM), 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001) (citing *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F.Supp. 683, 691–92 (D.N.J. 1993); *Economou v. Physicians Weight Loss Ctrs. of America.*, 756 F. Supp. 1024, 1032 (N.D. Ohio 1991) (parenthetical citations omitted) ("There is a recognized danger that former

23

franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor.").

The Court thus finds that Plaintiff will suffer irreparable harm without the injunction.

## III.   The Balance of Interests

The third factor that the Court has to consider is whether Plaintiff has shown that the balance of equities tips in its favor. *Slatery*, 956 F.3d at 923.

Plaintiff argues that it "suffers irreparable harm to its business reputation and customer goodwill each day that Defendants are permitted to continue operating their competing inspection business," while "Defendants will suffer only narrowly limited and entirely self-inflicted harm should injunctive relief be granted." (ECF No. 17-1 at PageID 285–86.)

In response, Defendants argue that "there would not be irreparable harm to the Plaintiff in not granting an injunction. By contrast, granting the preliminary injunction would be catastrophic to [JS] and [SREI], in that [SREI] would be put out of business, and [JS] would no longer have a livelihood." (ECF No. 44 at PageID 810.)

The Court finds Plaintiff's position well-taken and finds that the balance of equities here tips in Plaintiff's favor.

As the Court mentioned above, the Court recognizes that issuing a preliminary injunction would harm Defendants' business interests. That said, this finding should not overshadow the fact that TS voluntarily entered into valid franchise agreements and agreed that he would not compete with Plaintiff. (ECF No. 44 at PageID 785, 795–96.) By establishing SREI as a mere replacement of SRESI, Defendants created "a subterfuge in an attempt to avoid [these] contractual obligations." (ECF No. 17-1 at PageID 287.) Plus, unlike what Defendants

contend, issuing a preliminary injunction here will not necessarily deprive JS of his "livelihood."  (ECF No. 44 at PageID 810.)  JS is free to obtain the gainful employment he desires.  The only caveat is that he cannot do so in contravention of contractual obligations to which he is subject, or in ways that otherwise skirt the law.

The Court thus finds that the balance of equities tips in Plaintiff's favor.

## IV.  The Public Interest

Finally, the Court finds that issuing a preliminary injunction here would not be against the public's interest.  "While agreements not to compete are disfavored in Tennessee, they are frequently enforced when, by their terms, they are reasonable to protect a party's legitimate business interest."  *Ozur*, 2016 WL 8738243, at *5; *see Hasty*, 671 S.W.2d at (explaining that Tennessee law disfavors noncompete agreements).  Plaintiff has a clear interest "in protecting the value of the basic product it has to sell: its franchises."  *Pizzillo*, 2001 WL 120731, at *7. The Court thus finds that this factor weighs in Plaintiff's favor.

## CONCLUSION

For the reasons above, the Court finds that Plaintiff has met its burden of showing that it is entitled to a preliminary injunction to enforce the noncompete provision in the franchise agreements.  Because Plaintiff has a shown a likelihood of prevailing on the merits and the other factors weigh in its favor, the Court **GRANTS** Plaintiff's motion for preliminary injunction.

Defendants, their officers, agents, servants, employees, attorneys and all those in active concert or participation with them, including TruHome Inspection Services, Inc., whether on their own account, or as partner, employee, agent, advisor, consultant, or in any other capacity or for or on account of any person, firm, partnership, association or corporation, are prohibited,

directly or indirectly from operating, owning, being employed by, or consulting with any business conducting any type of residential and/or commercial building inspections, or providing residential or commercial property inspection services until May 4, 2021, within the Designated Territories identified by the maps attached to each Franchise Agreement, or within 10 miles of the outer border of each Designated Territory, or within a radius of 10 miles from the location of any other AmeriSpec® business in existence on May 4, 2020.

The Court further **ORDERS**:

1. The parties bargained for the one year to run from the date of the termination or expiration of the franchise agreements, so the one-year period will run from May 4, 2020.

2. Defendants shall comply with all confidentiality and post-termination and post-expiration obligations set forth in Sections 14.5, 16.3 and 19.5-.11 of the Franchise Agreements as follows:

   a. Cancel all assumed name or equivalent registrations relating to the use of the AmeriSpec name;

   b. Cease and terminate all use of the AmeriSpec® Names and Marks and the word "AmeriSpec," in any manner whatsoever, or any colorable imitation thereof, including all interior and exterior signs;

   c. Not indicate, directly or indirectly, in any manner that Defendants were ever affiliated with AmeriSpec in any capacity;

   d. Not identify themselves or any business as an AmeriSpec® business or as a franchisee of, or as otherwise associated with, AmeriSpec;

   e. Not use, in any manner or for any purpose, any name or Mark or any other indicia of an AmeriSpec® business; and

f.      Refrain from using, in any manner, for any purpose, any of AmeriSpec's system

of operation, concepts or methods of promotion, names, Marks or any other

indicia of an AmeriSpec® business.

**SO ORDERED**, this 10th day of July, 2020.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

27